DICKINSON, Justice,
for the Court.
¶ 1. The Mayor and Board of Aldermen of the City of Clinton (the “City”) seek reversal of Hinds County Circuit Court judgment allowing Scot Welch and Mary Welch (the “Welches”) to keep a tree house in their front yard. The City claims the tree house violates its zoning ordinance (the “Ordinance”). The Welches claim the Ordinance is not clear, does not prohibit their tree house, and — in any case — does not apply to their tree house, since they had permission from the City to build it.
¶ 2. Apparently, this case has struck a chord with the public. At oral argument, our courtroom was full. The City informed us in its brief that the Welches maintain a website supporting their cause. We are also informed that the parties have invested over $50,000 in attorney fees and litigation costs. In an editorial, the Clarion-Ledger — characterizing this litigation as a “cute case” of “[k]ids fighting big, bad city hall to save their treehouse, ... ”— nevertheless admonished this Court to “think twice before undermining zoning in Mississippi.” The Clarion-Ledger, Aug. 7, 2004, at 11 A.
¶ 3. We offer this preface to our decision today, only to assure the City, the Welches, the Clariorir-Ledger, and those members of the public who are interested, that this case has not been decided by popular opinion, but rather by applying the law to the facts presented to us. When (as here) the law requires us to invalidate, set aside, or otherwise prevent enforcement of a law or ordinance, we are persuaded that, to do otherwise, would undermine the constitution and our oaths of office.
BACKGROUND FACTS
¶4. The clouds of this “perfect storm” began to gather in late 1996, when the Welches moved to 218 Kitehings Drive in Clinton. Scot (an electrical engineer) and *418 Mary wanted a tree house in their front yard, so Mary sought approval from the City’s building inspector and zoning official, Julion Lowther. According to Mrs. Welch’s uncontradicted testimony, Lowther approved the project and indicated that no permit was required. Shortly thereafter, construction of the tree house began and was completed over the next several years at a cost to the Welches of over $5,000.00.
¶ 5. On September 22, 1999, the first of two building inspections[1] by the City’s building inspector took place at the Welches’ home. The-second[2] took place on September 26, 2000. Neither inspector complained about, or objected to, the tree house.[3] Indeed, the Welches claim, and the City does not dispute, that prior to the spring of 2002, there was no indication from the City or anyone else of a problem with, or objection to, the tree house.
¶ 6. Then, in early April, 2002, the City’s Zoning Administrator,[4] Gary Ward, investigated a telephone complaint from a citizen, and determined that the Welches’ tree house violated Section 401.05 of Clinton’s zoning ordinance.
¶ 7. Ward sent letters in April and May, 2002, advising the Welches of the alleged violation and threatening them with legal action should they refuse to move the tree house. The Welches obtained legal counsel and appealed Ward’s decision to the Board of Aldermen, requesting either a reversal of the decision, or a conditional use/special exception and/or a non-conforming use designation under the Ordinance.
¶ 8. A public hearing was held on July 23, 2002, on the issues of conditional use/special exception, and/or non-conforming use, before the Planning and Zoning Commission, which voted to send the matter to the Mayor and Aldermen without a recommendation.[5]
¶ 9. On August 6, 2002, the Mayor and Aldermen, in successive 6-1 votes, (1) upheld Ward’s finding that the tree house violated the Ordinance, and (2) denied the Welches’ request for a conditional use/special exception and/or non-conforming use. Aggrieved, the Welches filed a bill of exceptions in the Circuit Court of Hinds County, and Circuit Court Judge Tomie T. Green reversed the Mayor and Aldermen, holding that the City could not force the Welches to remove the tree house. The City now appeals Judge Green’s decision to this Court.
ANALYSIS
¶ 10. We begin our analysis by affirming three well-settled principles of judicial review. First, the circuit court’s role was not as a trier of fact, but rather as an appellate court. Board of Aldermen v. Conerly, 509 So.2d 877, 885 (Miss.1987). Thus, we look beyond the decision of the circuit court and examine the decision of the City.
*419 ¶ 11. Second, actions of a deliberative public body such as the Mayor and Aldermen will not be set aside unless found to be arbitrary and capricious. Broadacres, Inc. v. City of Hattiesburg, 489 So.2d 501, 503 (Miss.1986); Sanderson v. City of Hattiesburg, 249 Miss. 656, 163 So.2d 739, 741 (1964).
¶ 12. Third, we recognize a presumption of validity of a governing body’s enactment of a zoning ordinance. In attempting to hold such ordinances invalid, either per se or as applied, the burden of proof lies with the challenger and, where the matter in issue is “fairly debatable,” we will not disturb the governing body’s action. Petition of Carpenter v. City of Petal, 699 So.2d 928, 932 (Miss.1997). Having established the Welches’ difficult burden, we now turn to the City’s zoning Ordinance, beginning with the version in force when construction of the tree house began.

The prior zoning ordinance.

¶ 13. Section 410 of the City’s 1976 zoning ordinance, which was in force when the Welches began construction of the tree house, provided that “[n]o accessory building or use shall be located within the required front yard OF ANY MAIN BUILDING OR USE IN ANY DISTRICT .... ” Having prohibited “accessory buildings and uses” in front yards, the early ordinance then, in Section 201, defined “accessory building or use” as “[a]ny building or use which is subordinate or incidental to the main building or dominate use of the lot or premises.” Although this ordinance is not at issue, it is important to note that it provided a definition of the thing it prohibited.

The present zoning Ordinance.

¶ 14. As an initial observation, we wish to state that a zoning ordinance which simply prohibits accessory buildings in the front yards of residences would be difficult to challenge on constitutional grounds, even if no definition of “accessory building” were provided. That is to say, the term “accessory' building” does not seem SO’ vague or unclear as to render it unenforceable as a matter of law. However, the City’s Ordinance goes much further. It also prohibits something it calls “uses.” To further complicate matters, the City inexplicably removed from its Ordinance the definition of “accessory building,” and began applying to “accessory building” a vague definition of “structure.” Thus, the Ordinance not only prohibits accessory buildings, but it also prohibits “uses.”
¶ 15. The Welches are charged with violation of the’City’s Ordinance which was enacted in 1997. In its brief, the City sets .forth with clarity its position in this case:
The present Zoning Ordinance defines “accessory structure or use” in § 201 and prohibits them in front yards of any district in § 401.5.
¶ 16. This statement is not completely accurate. Although the Ordinance does, in fact, define “accessory structure or use” in § 201, it does not prohibit them in § 401.5. In fact, that section does not even mention “accessory structure or use.” The City’s Ordinance does not inform its citizens that the City applies the definition of “accessory structure or use” to “accessory buildings or uses.” Nor are we told why this is done. In any case, we must proceed to analyze § 401.5, as defined by § 201, and as applied to the Welches, to determine whether the Ordinance may be enforced against the Welches’ tree house.
¶ 17. The Ordinance was adopted in 1997, shortly after construction of the tree house began. Section 401.05 of this new Ordinance provides that “[accessory buildings or uses are PROHIBITED in the front yard of ANY district.” Although the *420 City continued to prohibit “accessory buildings or uses,” as it had in the prior ordinance, it removed the definition of “accessory building or use” from Section 201 of the prior ordinance, and replaced it with a new Section 201. This new section provides no definition for “accessory building or use,” but instead provides a definition of “accessory structure or use,” which is
[a]ny detached structure or use which is subordinate or incidental to the main building or dominate use of the lot or premises, excluding driveways, sidewalks, and fences.
¶ 18. Thus, a citizen can see that the Ordinance prohibits an “accessory building or use.” But in order to know what that means, the citizen must somehow know (without being told) to go to the definition of “accessory structure or use,” where they will learn that it is actually a “detached structure or use” that is prohibited. The trial doesn’t end here, for the citizen must then go to the definition of “detached structure.” Stated another way, the Ordinance says it prohibits “accessory buildings and uses,” but it actually doesn’t. ‘It prohibits “detached structures;” and it prohibits “uses.” Since the Ordinance prohibits two things: any “detached structure,” and any “use,” it remains only to determine whether the tree house constitutes a “detached structure” or a “use.”
¶ 19. According to the Ordinance, a “detached structure” is “anything constructed or erected, the use of which requires a fixed location on the ground, or attached to something having a fixed location on the ground.” A “use” is “the specific purpose for which land or a building is designed, arranged, intended, or for which it is or may be occupied or maintained .... ” These are the things prohibited in the front yards in Clinton.
¶ 20. In order to proceed with the analysis, we must first determine whether those terms, as used in the Ordinance and enforced by the City, are so vague and unclear as to render them unenforceable. If the Ordinance lacks sufficient clarity to advise citizens, including the Welches, of what is allowed and what is prohibited, it is unconstitutionally vague, and cannot be enforced. This leads us to a discussion of “vagueness.”
Vagueness — the concept
¶21. The state and federal governments, and their political subdivisions, are trusted with immense powers over the citizens living within their respective jurisdictions. Among the greatest of these is the power to regulate and control a citizen’s use of private property. When a governmental entity presumes to prohibit otherwise legal activity on a citizen’s private property, the constitution requires only that there be a-legitimate governmental purpose. City of Jackson v. McPherson, 162 Miss. 164, 138 So. 604 (1932), citing Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). However, the restriction must be reasonably clear, enabling a citizen to understand what is allowed, and what is not. . See generally City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999).
¶ 22. There is no issue here concerning the legitimate governmental purpose of Clinton’s Ordinance. The same cannot be said of its clarity. The City seems to find sufficient clarity in the prevention of a “use” in the Welsh’s front yard. Furthermore, the City appears to be untroubled by the notion that city officials who take office in Clinton long after the Welches’ children are grown, may apply the Ordinance to require citizens to remove from their front yards, not just tree houses, but anything which has been constructed and attached to the ground; or attached to something else which is attached to the *421 ground. In order to learn why should we not require city officials to make such decisions without benefit of a clear, unambiguous ordinance, we need only move a few feet from the front yard, into the street, for an illustration.
¶23. Few would question the vagueness of a city ordinance which provided no particular speed limits on the various streets of the City, but rather provides that citizens may not drive “too fast” on the streets of Clinton. Seemingly a good ordinance at first pass, since most reasonable persons would agree that no one should drive “too fast.” However, the concept of what is, and is not, “too fast” would certainly differ from citizen to citizen. More troubling, however, is the certainty that the concept will differ from one police officer to the next.
¶ 24. Additionally, we must express concern for those required by law to interpret the ordinance. As in the example, a vague, ambiguous ordinance places an unfair burden upon the judge or city official required to interpret the terms of the ordinance. Conversely, a clear, unambiguous ordinance eliminates the danger of conflicting standards. Reasonable people can disagree whether 40 mph exceeds a speed limit of “too fast,” but all must agree that 40 mph exceeds a speed limit of 30 mph.
¶ 25. It should be enough to say that citizens are entitled to fair notice of the meaning and breath of ordinances which restrict their liberty and the use of their property.
Vagueness — prior case law
¶ 26. The concept of vagueness is not new. We are guided by a legal principle which was easily recognized and agreed by counsel for the City at oral argument; that is, the Ordinance cannot be enforced unless it provides clear notice and sufficiently definite warning of that which is prohibited, and that which is allowed. The authorities for this proposition abound.
¶ 27. A governmental enactment is impermissibly vague where it fails to provide persons of ordinary intelligence a reasonable. opportunity to understand what conduct it prohibits. Hill v. Colorado, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (citing City of Chicago v. Morales, 527 U.S. 41, 56-57, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (ordinance prohibiting anyone from remaining “in any one place with no apparent purpose” held unconstitutionally vague)). See also Smith v. Goguen, 415 U.S. 566, 582, 94 S.Ct. 1242, 1252, 39 L.Ed.2d 605 (1974) (term “treats contemptuously” the flag of the United States held void for vagueness); Connally v. General Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926) (“not less than the current rate of per diem wages in the locality” so uncertain as to be unconstitutional); Hyatt v. Town of Lake Lure, 225 F.Supp.2d 647, 662-63 (W.D.N.C.2002) (term “shoreline” held unconstitutionally vague, as applied to the plaintiff); Lionhart v. Foster, 100 F.Supp.2d 383, 389-90 (E.D.La.1999) (term “annoy” within the statute held unconstitutionally vague); Central Ave. Enterprises, Inc. v. City of Las Cruces, 845 F.Supp. 1499, 1503-04 (D.N.M.1994) (ordinance requiring special use permit in order to operate an adult bookstore or adult amusement establishment unconstitutionally vague regarding the terms “specified sexual activities or specified anatomical areas”); People v. Lee, 345 Ill.App.3d 782, 281 Ill.Dec. 236, 803 N.E.2d 640 (2004) (ordinance which permitted arrest under “circumstances manifesting the purpose to1 engage in drug-related activity” held unconstitutional for vagueness); Nichols v. City of Gulfport, 589 So.2d 1280 (Miss.1991) (ordinance prohibiting “unnecessary or unusual noises ...” declared void for vagueness). Gene *422 sis of Mount Vernon, N.Y., Inc. v. Zoning Bd. of Appeals, 152 Misc.2d 997, 579 N.Y.S.2d 968, 974 (N.Y.Sup.Ct.1991) (ordinance which lacked clear criteria by which to distinguish a “boarding house” from a “family use” held unconstitutionally vague). People v. Donato, 179 Misc.2d 192, 684 N.Y.S.2d 394, 397 (N.Y. City Ct.1998) (city ordinance prohibiting “unnecessary animal noise” held unconstitutionally vague).
¶ 28. In Nichols, this Court held that a city ordinance prohibiting “unnecessary or unusual noises ... which either annoys, injures or endangers the comfort, repose, health or safety of others ...” was so vague that it violated “the first essential of due process of law.” Id. at 1282. Presiding Justice Dan M. Lee, speaking for a unanimous Court, stated that “[t]he law, of course, should give fair notice of offending conduct or else the law is void for vagueness.” Id.
¶29. Writing for the U.S. Supreme-Court in Connally, Justice Sutherland stated:
That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct. on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires- the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.
Connally, 269 U.S. at 391, 46 S.Ct. at 127, 70 L.Ed. at 328, citing Int’l Harvester Co. v. Kentucky, 234 U.S. 216, 221, 34 S.Ct. 853, 58 L.Ed. 1284 (1914); Collins v. Kentucky, 234 U.S. 634, 638, 34 S.Ct. 924, 58 L.Ed. 1510, (1914).
¶ 30. Similarly, a court has declared void'a statute requiring a railway company to run sufficient cars to accommodate passengers “without crowding.” United States v. Capital Traction Co., 34 App. D.C. 592, (D.C.Cir.1910). The court reasoned that, “[wjhat may be regarded as a crowded car by one jury may not be so considered by another. What shall constL tute a sufficient number of cars in the opinion of .one judge may be regarded as insufficient by another.... There is a total absence of any definition of what shall constitute a crowded car. This important element cannot be left to conjecture....” Id.
¶ 31. In Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), the United- States Supreme Court stated that “[vjague laws may trap the innocent by not providing fair warning,” and that “if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them.”
¶ 32. Thus, it is not a new or novel concept that we now apply to the facts of the case before us.
Vagueness — practical application
f 33. Against this rich, lengthy, broad and consistent background of federal and state precedent, we now analyze the City’s Ordinance for vagueness.
¶ 34. We understand that ordinances are often drafted as broadly as possible. This prevents having to draft a specific ordinance for each specific thing a city wishes to prohibit-including some thing which are unforeseen. This points out the dilemma faced in drafting many prohibitive ordinances. On the one hand, the ordinance must be broad enough to include a long list of similar things which cannot possibly be specifically included within the ordinance. ' On the other hand, it must not *423 be so broad as to render its meaning vague, unclear and capable of unintended consequences. When an ordinance falls into the “vague” category, citizens are left to the mercy, discretion and caprice, of a governmental official as to the use of their property.[6]
¶ 35. There are several factors which lead to our conclusion and decision in the case before us. First, we note that, for two decades, the City’s Ordinance prohibited (and defined) “accessory buildings” in the front yard at 218 Kitchings Drive in Clinton. For reasons we are not told, however, the definition of “accessory buildings” was removed in April, 1997. We are left to wonder whether to attach some significance to this unusual act.[7]
¶ 36. Additionally, the City provides no notice to the public that it utilizes the definition of “accessory structure or use” to define “accessory building or use.” The City provides to us no explanation why this definition is used, and why the public is not informed of it.
¶ 37. Finally, according to the Ordinance, an “accessory structure” can be either a “detached structure” or a “use.” We are then told there is no definition of “detached structure,” but there is a definition of “structure” which is “anything constructed or erected, the use of which requires a fixed location on the ground, or attached to something having a fixed location on the ground.” We find the application of this definition to Section 401.05 of the City’s Ordinance to be unconstitutionally vague.
¶ 38. We are also told that a “use” (a term also used to prohibit the tree house) is “[t]he specific purpose for which land or a building is designed, arranged, intended, or for which it is or may be occupied or maintained.” We further find the application of this definition to Section 401.05 of the City’s Ordinance to be unconstitutionally vague.[8]
¶ 39. With these definitions, the public is left to either guess what is an “accessory building,” and what is not, or appeal to the unfettered discretion of a City official who, on an ad hoc basis, decides the “accessory building” dujour,[9] This not only deprives the citizen of fair notice, but also unfairly requires the City official to make a decision without providing a clear standard or guideline.
¶ 40. The City would simply trust its building inspectors, from year to year, to make fair decisions while enforcing a vague, ambiguous Ordinance. One building inspector might do just that. Another, however, might not.
¶ 41. It bears repeating that we would be less troubled by an ordinance which simply prohibited accessory buildings in the front yards of residences. We find the term, “accessory buildings,” when used in conjunction with a residence, to be reason *424 ably clear and understandable. However, the City’s Ordinance does more. Much more. It also prohibits “use.” As discussed supra, a review of the City’s definition of “use” leaves us bewildered as to why the City would want to prohibit it. To demonstrate the vagueness problem, we provide a hypothetical application of the Ordinance from a citizen’s viewpoint in Appendix A, hereto.
¶ 42. The City provides us no argument or authority which rescues the Ordinance from our finding of vagueness; nor does it provide authority to contradict the numerous cases cited herein which constitutionally prohibit the enforcement of vague statutes and ordinances; nor does it address or explain the specific flaws[10] we find with the Ordinance, and have discussed herein.

Equitable estoppel (laches).

¶43. The Welches claim the City should be equitably estopped from requiring removal of the tree house. Equitable estoppel is defined generally as
the principle by which a party is precluded from denying any material fact, induced by his words or conduct upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was allowed.
The doctrine of estoppel is based upon the ground of public policy, fair dealing, good faith and justice, and its purpose is to forbid one to speak against his own act, representations, or commitments to the injury of one to whom they were directed and who reasonably relied thereon.
Koval v. Koval, 576 So.2d 134, 137 (Miss. 1991). Cities are not immune from the doctrine of equitable estoppel. This Court has held that “the state and its political subdivisions ‘may be equitably estopped under the proper circumstances.’ ” Hill v. Thompson, 564 So.2d 1, 14 (Miss.1989) citing Board of Trustees of Monroe County Bd. of Educ. v. Rye, 521 So.2d 900, 908-09 (Miss.1988); Suggs v. Town of Caledonia, 470 So.2d 1055 (Miss.1985); Covington County v. Page, 456 So.2d 739 (Miss.1984); State v. Stockett, 249 So.2d 388 (Miss. 1971).
¶ 44. The Welches’ claim of estoppel is based primarily upon Mrs. Welch’s testimony that she received verbal approval to build the tree house in 1996 from the City’s building inspector/zoning official, Ju-lion Lowther. The City makes light of Mrs. Welch’s uncontradicted testimony, and questions her veracity. After carefully reviewing the record before us, we conclude that there is little reason or basis for disputing Mrs. Welch. And there is much to support her.
¶ 45. After receiving approval from Lowther, construction began and continued for several years in broad daylight, and plain view of the public and the City. It is not likely, we think, that Mrs. Welch is being untruthful. Instead, we are persuaded that Lowther approved of the tree house, as Mrs. Welch testified. This would certainly explain why, for over five years, the City took no action to halt construction, or have the tree house removed. It would also explain why there was no complaint or comment from either of the City’s inspectors who visited the Welches’ property to make inspections during the five-year period and walked within the shadow of the tree house.
*425 ¶ 46. We realize that the City cannot notice or be aware of every code and zoning violation within its jurisdiction. But this alleged violation is a $5,000.00 tree house in a clump of sweetgum trees in a front yard on a public street, in plain, open, obvious sight. Beginning at least in April, 1997, the City’s zoning Ordinance required the Zoning Administrator to “[m]ake periodic checks for violations....” Over a five-year period (assuming such required “checks” were, in fact, made), the City knew or should have known about the tree house.
¶ 47. Mary’s testimony, Lowther’s approval, a substantial investment by the Welches, and the City’s apparent acquiescence for five years, led Judge Green to apply the doctrine of equitable estoppel, preventing the City from requiring removal of the tree house. The City warns us of dire consequences which will surely spring from the trial court’s ruling:
What if a policeman or fireman had gone onto the Welch property or passed by on the street? ... Under the reasoning of the Circuit Court, any city employee could agree to and bind the City to anything and any alleged observation by any city employee would impute knowledge to the city, thereby binding the City by the actions or inactions of its employees.
¶ 48. This argument is either disingenuous, or blind to the facts presented in the record before us. The City’s Building/Zoning Inspector (not a policeman, fireman or some other city “employee”) approved construction of the tree house. Thereafter, the City sat by in silence while the Welches invested thousands of dollars in reliance on the approval. Now, many years after completion of the tree house, the City seeks to enforce its ill-defined Ordinance. The same Zoning Administrator who seeks to force the Welches to remove the tree house had a duty to make periodic checks of the property in the City for violations of the Ordinance. This duty has existed at least since April, 1997.
¶ 49. We have not been provided with a complete copy of the City’s prior zoning ordinance. However, we were provided a complete copy of the 1997 Ordinance. Therein, the City vested its Zoning Administrator with certain powers and responsibilities. Article XXIV provides:
SECTION 2400 — PURPOSE OF THIS ARTICLE
It is the purpose of this Article to prescribe the legal devices and procedures for administering and enforcing this Ordinance and to define the duties, powers, limitations and scope of jurisdiction for the various persons and groups which are concerned with the administration and enforcement of this Ordinance.
SECTION 2401 — DUTIES, POWERS, AND LIMITATIONS OF POWERS OF THE ZONING ADMINISTRATOR IN THE ADMINISTRATION AND ENFORCEMENT OF THIS ORDINANCE.
2401.01 Duties of the Zoning Administrator:
* * *
(b) Provide information to the public on matters relating to zoning.
* * sfc
(l) Make periodic checks for violations or investigate all complaints of violations of this Ordinance ...
(M) Report uncorrected violations to the Mayor and Board of Aldermen and recommend action to prevent or halt violations of this Ordinance.
*426 * *
(q) Provide administrative interpretation as provided in Subsection 2401.02.
2401.02 Administrative Interpretation by the Zoning Administrator:
In the event there is a question as to the general intent or specific meaning of any provision of the Zoning Ordinance text, ... the Zoning Administrator shall have the power to make such administrative decisions and interpretations. Such decisions or interpretations shall be made in writing by the Zoning Administrator.
(emphasis added).
¶ 50. We are somewhat troubled by the absence of written approval, as required by § 2401.02 of the new Ordinance. However, we do not know whether written approval was required at the time Lowther approved the tree house. Additionally, even if it was, the requirement that the interpretation be in writing is a procedural requirement. We are reminded by the City in its brief that “it is the City which is vested with final authority for determining whether its procedural requisites have been met or, if it pleases, waiving them.”[11] Thrash v. Mayor & Comm’rs of City of Jackson, 498 So.2d 801, 807 (Miss.1986).
¶ 51. We can provide little improvement to Circuit Judge Green’s discussion of equitable estoppel in her Memorandum Opinion rendered in this case on July 23, 2003, which we incorporate herein:
The record before [the Circuit Court] shows that the Welches’ began construction of their treehouse prior to the effective date of Clinton’s current zoning Ordinance, April 4, 1997. The Welches sought and obtained lawful permission/authorization to construct their treehouse from a city official authorized to render such a decision. While Clinton disagrees with the testimony and photographs depicting the time frame of the treehouse’s initial construction, Clinton offered nothing into the record to rebut or contradict the Welches’ proof.
Inasmuch as the record tends to support the Welches’ contention that they began building their treehouse prior to the adoption of the city’s April 1997 Ordinance, the City’s denial of the Welches’ application for a non-conforming use must be examined to determine whether the city’s actions were unreasonable, arbitrary, and capricious in its interpretation and application of its past and present zoning ordinances.
In light of Mississippi law and the principles of agency and equitable estop-pel, the doctrine of “equitable estoppel” is generally defined as “the principle by which a party is precluded from denying any material fact, induced by his words or conduct, upon which a person relied, whereby the person changed his position in such a way that injury would be suffered if such denial or contrary assertion was followed.” Koval v. Koval, 576 So.2d 134 (1991); PMZ Oil Co. v. Lucroy, 449 So.2d 201 (Miss.1984); Town of Florence v. Sea Lands, Ltd., 759 So.2d 1221 (Miss.2000); and Walker v. City of Biloxi, 229 Miss. 890, 92 So.2d 227, 229 (1957).
The doctrine of estoppel is steeped in the foundations of public policy, fair dealing, good faith, and justice. Its purpose is to forbid one to speak against its own act, representations, or commitments to the injury of one to whom they were directed, and to whom they reason *427 ably relied thereon. Koval, 576 So.2d at 137.
Under Mississippi law, “equitable es-toppel” is a rule of equity which generally prevails over most other rules. In the appropriate cases, the doctrine operates to cut off the rights or privileges conferred by statute or even by the constitution. Koval, 576 So.2d at 137 and 28 Am.Jur.2d 647, § 34.
When applying the doctrine of [equitable estoppel], “the test is whether it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action thereon.” Koval, 576 So.2d at 138 and PMZ Oil Co., 449 So.2d at 201.
The City must be bound by Julion Lowther’s interpretation that the Welches’ treehouse did not fall into the classification of an “accessory building or use.” Lowther was the City’s employee — [its] agent and representative in the zoning office. His responsibility clearly required him to interpret city ordinances and to advise citizens properly. Additionally, though the City’s building inspectors, it had knowledge of the existence of the treehouse, somewhat ratifying Lowther’s interpretation.
The Welches testified that hundreds of hours and thousands of dollars have been spent in constructing their children’s tree house. They believed and relied upon the City employees’ representation and the actions or inaction that they could construct their treehouse in their front yard. It is undisputed that the Welches changed their position as a result of Lowther’s interpretation. They moved forward to spend at least two (2) years and thousands of dollars to construct their “treehouse.” The Welches have certainly suffered a detriment by relying on the City’s actual and constructive knowledge and acquiescence in the construction of the Welches’ treehouse.
In Walker v. City of Biloxi, supra, the Mississippi Supreme Court stated that “waiver estoppel or laches may operate under certain circumstances to preclude relief against zoning ordinances or regulations.” The Court has also held that the State of Mississippi and its political subdivisions may, under appropriate circumstances, be equitably estopped from taking inconsistent positions. Hill v. Thompson, 564 So.2d 1 (1989) and Town of Florence, 759 So.2d 1221. In PMZ Oil Co. v. Lucroy, supra, our Supreme Court stated that “whenever in equity and good conscience, persons ought to behave ethically toward one another, the seeds for a successful employment of equitable estoppel have been sown.”
¶ 52. In summary, we find for three reasons the City may not apply the Ordinance to require the Welches to remove the tree-house from their front yard. First, we agree with the Circuit Court’s holding that the doctrine of laches applies to the facts of this case, and the City is equitably estopped from requiring removal of the tree house, based upon the City’s interpretation of Section 401.05 of its Ordinance. We also find Section 401.05 of the Ordinance to be unconstitutionally vague, as applied.[12] Finally, we find the City violated Section 2411.03 of its own Ordinance, which states, inter alia: “Only in case of a tie vote may an application be forwarded to the Mayor and Board of Aldermen ‘without recommendation.’ ”
*428 ¶ 53. We do state, however, that our holding today is limited to the facts of this case. We find no fault with the City precluding “buildings,” or even “accessory buildings” in the front or side yards of homes. However, when the City adds to the prohibition the term, “use;” and it employs definitions of “use” and “accessory structures” so broad and vague that virtually anything could fall within the Ordinance’s purview, it crosses the constitutional line.
CONCLUSION
¶ 54. For the reasons stated herein, we affirm the judgment of the Circuit Court of the First Judicial District of Hinds County prohibiting enforcement of section 401.05 of the Ordinance, as it is alleged to apply to the Welches’ tree house.
¶ 55. AFFIRMED.
COBB, P.J., EASLEY AND RANDOLPH, JJ., CONCUR. SMITH, C.J., CONCURS IN PART. CARLSON, J„ DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, P.J., SMITH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED IN PART BY WALLER, P.J., CARLSON, DICKINSON AND RANDOLPH, JJ. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.

. This inspection involved an electrical service panel upgrade.

. This inspection by building inspector Roger McNeese was of the Welches’ garage enclosure.

. Based upon the evidence in the record before us, we take judicial notice that the inspectors could not have entered the Welches' property without encountering the tree house.

. By this time, Lowther had passed away.

. Section 2411.03 of the City’s current Ordinance states, inter alia: "Only in case of a tie vote may an application be forwarded to the Mayor and Board of Aldermen 'without recommendation.’ ” We are not told how the City avoided complying with its own Ordinance.

. Today’s official who hates birds may easily exclude all bird houses under this Ordinance; while tomorrow's official who loves birds may allow them.

. We find it unusual that the City would continue to prohibit a specific thing, but remove from its Ordinance the definition of the thing prohibited. It would be far more understandable had the City never provided a definition.

. The City makes no attempt to address or justify the prohibition of "use.” Nor does it suggest how "use,” as defined in the Ordinance, could be understood by anyone.

.We are not told how, when, or why, the City decided to use the definition of "accessory structure” to define "accessory building.” There is no requirement that the City continue to use this definition, and no assurance that it will not begin to use another, without any notice to the citizens whose property it proposes to regulate. This is the very essence of a vague, arbitrary ordinance.

. Such flaws include the Ordinance’s prohibition of "uses” which — according to the City’s own definition — prohibits a property owner from using his or her front yard for "[t]he specific purpose for which land or a building is designed, arranged, intended, or for which it is or may be occupied or maintained.” The literal application of this prohibition would seem absurd.

. The City cites this authority in explanation of its own procedural violation. See fn. 5 & accompanying text, supra.

. Because we find the Ordinance may not be enforced, we need not reach the other issues raised by appellants.